Case 21-1491 USA v. Abiodun Fabode. Oral argument 15 minutes per side. Mr. Schulman for the appellant. Good morning. Before I start, I would indicate to the court that a supplemental brief was filed late yesterday. When I checked in this morning with the clerk, they said that it had not been presented to your honors, but they would print it out and it should be before you this morning. Thank you. Do you want to reserve time for rebuttal? Yes, I'm saving five minutes for rebuttal. May it please the court. There are several issues before the court this morning. Mr. Fabode is a pharmacist who is practicing in Detroit, Michigan. He opened a pharmacy near a hospital. He had a jury trial in this matter. And the question before the jury was whether or not Mr. Fabode was responsible for distributing oxycodone, amongst other things, to patients of the pharmacy, and whether he had done it outside the scope of his pharmacy practice. Mr. Schulman, if we want to just get right into the issues, we've read Ruan. The case really turns, it seems to me, on whether that requires a reversal in this case. You claim in your supplemental filing that what you say to be the error in the instructions here is structural, but you cite Nieder. And in that case, they found it was not structural. It seemed to be a more serious defect in that case than in this case. So what's your best argument that this is a structural error here? Well, respectfully, we believe it is a structural error. The case would have rested on Mr. Fabode's mens re and the scienter, and whether or not he had a subjective belief that the... Well, did you raise that in the trial of the case? Well, it wasn't raised in the trial because the controlling authority at the time was based on an objective standard, not a subjective standard. You set out what the two different theories are in different circuits, but this was not preserved, was it? It was, because we raised it as soon as Ruan became, as soon as it was on our radar that the Supreme Court had granted certiorari on Ruan. We raised it in our original brief on the appeal. It was in a footnote, but it wasn't just a mere passing reference to it. We believed that the decision would be coming out shortly, and it was on our radar, but at the time, the controlling authority was what it was, which was the... You had two different authorities, one in this circuit and one in another, and you objected, but you didn't preserve it later, did you? I mean, once the court advised the jury of the law, did you say, well, I want to have my objection here with the court, right? Well, the jury trial occurred in November of 2019, so it was long before Ruan was up for appeal. I believe that the Ruan case was in 2021, so it was long before the Ruan case was heard before the Supreme Court. But even Ruan had to make the objection, right? Ruan had to object in his own case in order to not have it be treated as plain error. Right, so somebody always has to make the first argument. They always have to preserve the argument. Sure. And so if Ruan had to preserve his own argument, why didn't you have to preserve the Ruan argument? Well, again, the issue was, we were faced with the binding precedent of the Sixth Circuit at the time, so whether or not there was a split between other circuits, we were bound to the binding precedent of the Sixth Circuit at the time. And then what about, okay, so what about in this court? Did you raise this issue in your opening brief in this court? Yes, on page 14 of my original brief. But you didn't do a lot to develop it, is that? Well, it really couldn't have been developed until there was a determination by the Supreme Court. I mean, the Ruan case is very strong in terms of the language, and it really changes the way that the case would have been presented to the jury had the Ruan case been the binding precedent at the time. Because during the jury trial, the question was really whether or not he was acting in a reasonable manner. It was really a question of whether he was negligent, not whether there was a sufficient mens re to show that he had knowledge and intent to violate the statute. So what Ruan was talking about was an instruction, and you say that didn't have a thing to do with this case, right? Well, when we talk about the instruction that was given to the jury, the instruction was merely that the government must prove beyond a reasonable doubt that the defendant pharmacist knowingly and deliberately conspired to distribute or actually distributed or aided and abetted the distribution. And the question that was posed to the jury was whether the pharmacist acted in good faith in the usual course of professional practice and in accordance with the standard of pharmacy practice generally recognized and accepted in the United States. The jury instruction goes further to state that good faith connotes an observation of conduct in accordance with what the pharmacist should reasonably believe to be proper pharmacy practice. It doesn't ask whether or not the pharmacist had the subjective intent to knowingly and deliberately conspire to distribute the medication in violation of the statute. Well, the government says that even if you preserve the error, that it complies with what Ruan says. Well, I don't believe that to be the case. I think the evidence would have been presented differently in the case if we were focusing on my client's subjective intent. Instead, what happened was the government tried to prove the case or they indeed proved the case based on things like red flags, things like saying that the doctors were slotted and that there was pattern prescribing, things that would be objectively viewed, not looking at my client's subjective intent. But you have to prove subjective intent circumstantially as a practical matter. He's not going to say to somebody, hey, I know that this is illegal, but don't tell anybody. So it just seems like there's overwhelming evidence here that your client knew exactly what he was doing here and it didn't comport with his professional responsibilities. I mean, he sells these drugs at exorbitant prices. He hands the prescriptions directly to recruiters, not to the patients. He works with this devishar, however you say his name, to keep up a steady flow of clients. And then as a practical matter, there's evidence, as I understand it, that he even advised that doctor how to manipulate the prescription data to avoid detection. Now, if that's what the evidence shows and the jury is entitled to believe it, then it just seems hard to believe that there was a different way to present this case, either from the government's standpoint or from your standpoint. Well, respectfully, I disagree. There was a different way to present the case and it would have focused more on his intent. He should have been entitled to an instruction, as Ruin suggests, where we focus on his mens re and whether or not he had the subjective intent to violate it. I get all that, but you're answering questions with all due respect in just generalities. Well, it's structural because it's structural. I would have presented it differently because I would have presented it differently. So give us, if you would, some concrete examples about how this case would have gone down differently. Now, you can't speak for the government about how the government was going to try the case. So let's just say the government was going to try it the same way they did. What would you have done differently that you say you were basically precluded from doing because of circuit law? Well, my client spent an excessive amount of time with his partner in the business going out to meet with the doctors and validating whether the prescriptions were actually written by the doctors themselves. We had to focus our defense mainly upon, you know, the expert, Carmen Catazon, who was testifying. Hold on for just a second. I've read all this stuff. I don't remember seeing it any place where there's any discussion about your client and his partner going out to meet with doctors to verify they really wrote the scripts. Is that in the record? It's in the record. I'm not sure if it's in our appeal brief. Again, because at the time that we wrote the original appellate brief, RUIN had been granted certiorari by the U.S. Supreme Court, but there was no decision at the time. Again, we would have presented the case differently, and I believe that if the focus was on the scienter of my client, I don't think the government would have been able to prove beyond a reasonable doubt that he had that necessary intent. I get that, but how? Tell us what you would have done differently. As I stated, my client spent a good deal of time verifying the prescriptions, meeting with doctors, actually going out to doctors' offices, meeting with them, showing the doctors the prescriptions before filling the prescriptions. There was also evidence... But you presented all of that evidence to the jury. It's not that... That's correct. Yeah, so the jury heard all of that. However, the jury wasn't instructed that they should focus on the mens rea. They weren't instructed that it was really a question of his subjective belief. The standard was reasonableness. So you wouldn't have tried it differently. You would have argued it differently. Absolutely. I absolutely would have argued it differently. The question would have been on the focus of his subjective intent and whether the government had met their burden of proof beyond a reasonable doubt on the subjective intent. And that's a central focus. It's a real high bar that the government must prove to get a conviction in this case. Why wasn't it enough for the jury to credit the co-conspirators who testified against your client at trial? And as I understand it, they linked your client to every facet of this alleged conspiracy. Patient recruitment, planning, drug sales, cover-up attempts, everything. Well, that's not exactly correct. In fact, there were three or four counts that my client was not convicted on, that they didn't agree with the government's assertion that he was guilty beyond a reasonable doubt. They didn't agree with the assertion that he was guilty beyond a reasonable doubt on the various... on the other types of narcotics, the Schedule 2s, 3s, 4s. They didn't agree with whether or not my client was guilty with respect to a couple of the counts, a couple of the other patients who presented their prescriptions to the pharmacy. So they didn't agree with all the counts that the government was advancing. Does your client, is he aware of the fact that Judge Edmonds really departed by 50%? If it goes back, he might get more time than what he's gotten out. Does he know that? He should. I understand. The 50% was based on what we believe to be an incorrect scoring of the guidelines. If the guidelines were scored correctly, it would have been a level 32 rather than a 36. And if Judge Edmonds, if that was the formula that Judge Edmonds was using to sentence him, he would have received a substantially lower sentence than 96 months, which was half of 188 months. But it goes both ways, right? Of course. Yes, of course. Counsel, I don't see a light on your podium. But looking at the clock, I'm guessing your time has expired. There's no light. I see no time clock light on the podium. There's no timer going off here. So unless my colleagues have further questions. Thank you. And maybe we can find a light before the government begins the argument. Good. All right. Thank you. We'll hear from the government. May it please the Court, Jessica Curry for the United States. This Court should affirm for two reasons. First, the District Court's drug quantity estimate was not clearly erroneous. And second, any Ruan challenge was waived on appeal and the instructions here were not plainly erroneous anyway. As for drug quantity, the law allows for conservative estimates. There was no requirement here to go script by script, doctor by doctor, and then crunch the numbers with precision. Here, the District Court used a method that was conservative in four ways. But doesn't our case law say that where the PSR is contested, the District Court has to make explicit findings, and the District Court here just kind of said, well, I rely on the PSR. So are we stuck with that, or is that? The District Court did not adopt the PSR. It went an additional conservative step beyond the PSR. And the only part where it's not as explicit as it could be is when she cut the government's estimate in half. So she agreed with three conservative steps that the government proposed and that was also reflected in the PSR. The Court only considered the drugs dispensed during the conspiracy period by Friends Pharmacy, not the other two pharmacies involved. It only considered the two most highly diverted types of opioids. From there, it only considered the most highly diverted dosages of those two types of opioids. And fourth, over the government's objection, and different from the PSR, the District Court only considered the subset of those pills that Fabody personally dispensed. So the first three steps were what the government had proposed. In adding the fourth conservative measure, the District Court was aware that Fabody and his business partner alternated work weeks for roughly an even split of labor. So it is intuitive and can be reasonably inferred by this Court that the District Court cut the government's estimate in half. And if you do that, that yields approximately 24,000 kilograms of converted drug weight. That's the high end of the quantity range for base offense level 34, which is what the District Court held applied here. The base offense level itself also has a conservative feature because there's 20,000 kilograms of wiggle room. And here, the effect of that was to reduce the District Court's estimate to a quantity as low as 10,000 kilograms of converted drug weight. So that's the background of how the estimate came about. It's important to keep in mind both the standard of review here and the burden of proof below. The question is, did the District Court clearly err in arriving at an estimate, not an exact figure, by a preponderance of the evidence? Here, there was no clear error. The record shows that the conspiracy spanned years. It included a large network of pharmacists, doctors, and patient recruiters. There was a pill mill operating within the walls of Friends Pharmacy. I apologize for interrupting you, but you might take note, we didn't ask any questions of your other counsel about sentencing issues or drug quantities. So you might want to at least make sure you leave enough time to focus on what we've sort of telegraphed to you that we're interested in. Absolutely. Shifting to the Ruan challenge, that challenge was waived in this appeal. The Ruan case was pending. Vobody and his counsel was aware of that pending split, and there was absolutely no analysis to explain why relief should be granted here or anything to overcome the plain error standard. In this court? In the district court, it was probably sufficient, do you think, for them to say, well, there's this case out there, we preserve our objection, but we know you're bound by the Sixth Circuit rule. That would have been sufficient below, but that didn't happen in this case. There was no... No mention in the district court of Ruan. No. That came about on appeal. It was noted in the footnote. But did the defendant ask for a more clear subjective intent instruction when the instructions were being settled by the district court? There's nothing in the record to suggest that, Your Honor. It does not appear that an alternative instruction was proposed or any tweaking to the instruction that was given, and according to the briefing here, it was appellant's position, this is settled Sixth Circuit law, and there wasn't a dispute to be made. But as Your Honors have pointed out, somebody has to object. The Ruan defendant objected. Rehafe is another case where error was eventually deemed by the Supreme Court, but somebody has to preserve that issue. Under our authority, and the government had cited to Greer in its supplemental brief, there's not a futility exception to preservation that does have to occur unpreserved. Let's assume it's preserved. So why does this instruction comport with Ruan, at least in terms of a clear error standard or a plain error standard? Because substantively it connotes the same or very similar meaning. When the instruction used the words, defined good faith, it did so in terms of good intentions and honest judgments. Both those parts of the instruction connote a more subjective intent, and read as a whole. Doesn't it go on to say that you measure that by an objective test? What a reasonable pharmacist would have done? Yes, and that is still consistent with Ruan, which states that objective criteria is still going to be relevant. That's what you measure conduct against, and the more conduct deviates from objective criteria, the more likely then that the defendant had the requisite mens rea. What exactly did the defendant raise when they were considering the instructions at the trial? Was Ruan mentioned at all? Of course, I know it hadn't gone to the Supreme Court, or it hadn't been decided. It wasn't raised at all? The record contains no reference to Ruan below. The first reference is on appeal in a footnote. Well, cert hadn't been granted at that time either, right? Below, cert hadn't been granted. That is correct. By the time we were on appeal and in appellant's opening brief, certiorari had been granted, and so the footnote is explaining the pending case, but without taking us through the steps that would warrant relief. It sounds to me like you're saying, well, the jury instruction substantially complied with Ruan, so there was no error. What if we thought that's not quite right, but he still has to show prejudice on plain error? Do you want to speak to that? Yes. There's overwhelming evidence that Fabote knew that he was acting in an unauthorized manner. There was evidence that he was covering up his tracks, and not just with slotting. There was data manipulation as well. There was evidence that Fabote knew that the patient recruiter who testified at trial, Naishia, was a drug dealer. So every script that she is bringing in, knowing that she's a drug dealer, any feeling that script is, there's the requisite intent that this is not an authorized prescription to fill, he never called Dr. Dasikachar to verify the scripts. So we have a very big deviation from just very standard protocol. There was also text. Stop right there. Your opposing counsel said that he actually went out to a number of the doctor's offices personally to verify that they had written these prescriptions. Is that corroborated by the record? For Dr. Dasikachar, who was the main doctor here, no. He said, Dr. Dasikachar's testimony was that there was no efforts to verify the prescriptions. And Naishia, the patient recruiter, also dispelled or contradicted any claim that she was sort of looked into whether she was a valid caregiver. She was not. She testified she was dealing these drugs on the street. She did not have a sort of business in which she was assisting real patients. All of her patients were fake. And she testified to that effect. There was also testimony that this scam was so obvious that it would be obvious to any medical professional. She testified to that? That was Dr. Dasikachar at page ID 1566-67. He explained this was very obvious. And it was obvious because these patients, these fake patients that were coming in, if they came in at all, were ambulatory and their prescriptions were all basically the same. We've got the same opioids and the same dosages. Again, the most highly diverted types and dosages of opioids that were being dispensed through this pharmacy. Was the defendant in a position where he could see that this is what is happening? Or did he just look at the prescriptions and fill them out, give them to whoever brought them in? There are multiple things he would have perceived. He is interacting directly with Naishia, who he knows to be a drug dealer. The scripts themselves would also, again, because of their nature being all essentially the same dosage and types of opioids, that would have been a red flag. And he's not even looking into it because he's not calling to verify through Dr. Dasikachar. So there are multiple ways that his knowledge shown through at trial and that the jury, even if it had received an instruction exactly like the one suggested in Ruan, they would have still found him to have that requisite mens rea in this case. What about the argument that was made last night by Mr. Shulman that this is a structural error? It's not a structural error under precedent. Greer is a case that states that pretty clearly. That dealt with a rehafe error, similar a mens rea element not being in there properly, and that does not affect the whole proceedings. It's one element and therefore not structural. So I would simply turn to that precedent. Mr. Shulman argues that even though Nieder says omitting a required instruction is not structural error, he says that this is somehow worse than admitting something because the instruction that was given was wrong. So do you have a response to that? Yes, I don't think that argument logically follows. Instruction that is closer to the required standard is less likely to result in error than omitting an element entirely. So I think if anything, Nieder supports the government in that respect. Unless the court has further questions, I would briefly conclude. For these reasons, the government respectfully asks that the court affirm the judgment below. Thank you. Thank you. Thank you for your rebuttal. I think it's important to point out that Dr. Desiccatcher was only in the pharmacy for about two to three months, and during the entire period that he was working in the pharmacy, he was behind two doors and a curtain. So my client, who's working in a busy pharmacy, focused on the patients that are coming in, filling the prescriptions, didn't see what Desiccatcher was doing behind two doors and a curtain. The medical side of the pharmacy, the doctor's office, was outside of his view. And also Dr. Desiccatcher testified that he didn't want Fibotti to know what was going on. In fact, that's why he moved out of the pharmacy shortly after being there, after two to three months. He moved into a building next door. Was your client in a position where he could see these patients that are getting their prescriptions, and see whether they're crippled up or coming in high-stepping or whatever they were doing? Obviously, Your Honor, when patients come in and have their prescriptions filled, they're interacting with the pharmacist. But pain is a – lots of people deal with pain and take pain medication that you wouldn't know are on pain medication or are dealing with pain. Pain is a real subjective thing. They were pretty big quantities, weren't they? They were – it was – Big. Yes. I mean, it was pain medication that was being prescribed by a doctor. And as was pointed out in our brief, there were 1,115 patients that had been prescribed that medication by many doctors, over 100 doctors, and doctors that were practicing out of the hospital nearby the pharmacy. So it's not – again, this is really a question of whether my client had the subjective belief that he was dispensing these outside of – that he was knowingly and intentionally filling prescriptions for patients that didn't require pain medication. And that's really not – his focus is making sure that the prescriptions were validly written by the doctor themselves that prescribed it. My client's not doing medical examinations or examining medical records. That's just not what pharmacists do. Can you think of any other examples where pharmacists are handing drugs to known drug dealers who are presenting them on behalf of patients that are not there? Well, respectfully – We handle a lot of these pill mill cases, and these are facts that I've never seen in one of these cases. Sure. That's assuming that my client knew that Naisha was a drug dealer, and we disagree with that assertion. She presented herself as a caregiver, and she had indicated that she was – she would come in with the patients, the patients would sign a form saying that she would be entitled to pick up the medication on their behalf as was the course of practice. But, again, it's really – the focus should be, under RUAN, whether or not my client had the mens rea and whether he had the subjective intent to violate the statute. Did your client testify in this case? My client did testify in this case. He just said it was a mistake or something to that effect? Well, no. He indicated that he didn't know that Naisha was a drug dealer. He indicated that he had verified the prescriptions. And, again, this was a small sampling of patients that came into the pharmacy. Naisha, I believe, testified – and it's in my brief, if I state this incorrectly – I believe that she testified that only about 20 to 30 patients out of all the – about 80 patients that she brought to Desiccateur and other doctors were filled at the pharmacy. It was a small sampling of patients, and the government seeks to say with a broad brush that every prescription that was filled for oxycodone and oxycontin and oxymorphone were illicitly prescribed and filled, and that wasn't the case. And so we believe that there was a clear error here and that the conviction should be vacated and remanded back to district court for further proceedings. I see that my time is out, and I thank you for considering this case this morning. Thank you for your arguments. We'll give counsel a minute to switch places, and then the clerk can call the next case.